UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------X
THE SIKH CULTURAL SOCIETY, INC.,

                   Plaintiff,

             - against -

UNITED STATES CITIZENSHIP AND
IMMIGRATION SERVICES,

                  Defendant.
----------------------------------------------------------X

               **MEMORANDUM AND ORDER**
                 15-CV-5158 (RRM)

ROSLYNN R. MAUSKOPF, United States District Judge.

       On September 4, 2015, plaintiff, The Sikh Cultural Society, Inc., ("SCS"), which owns

and operates a Sikh temple (the "Temple") in Queens, New York, commenced this action against

defendant, United States Citizenship and Immigration Services ("USCIS").  (Compl. (Doc. No.

1) at 2.)  SCS seeks judicial review, pursuant to the Administrative Procedure Act,

5 U.S.C. § 701 *et seq.* (the "APA"), of a decision of USCIS's Administrative Appeals Office (the

"AAO") affirming the denial of an immigration petition for a "special immigrant" visa pursuant

to 8 U.S.C. § 1153(b)(b), which provides for, *inter alia*, special immigration status for aliens

employed in the United States as religious workers.  (*Id.*)  SCS filed the petition on behalf of

Birender Singh ("Singh"), alleging that it wished to employ Singh as a "kirtanakar," or

devotional hymn singer.  (Compl. at 4.)  SCS seeks to have the AAO's decision set aside as

arbitrary and capricious and unlawful under the APA.  (Compl. at 5.)  SCS and USCIS have

cross-moved for summary judgment.  (*See* USCIS Br. Summ. J. (Doc. No. 14); SCS Br. Summ.

J. (Doc. No. 13-1).)  For the reasons below, the Court finds that the petition was properly denied.

As such, SCS's motion is denied, and USCIS's motion is granted.

## STATUTORY AND REGULATORY FRAMEWORK

Pursuant to 8 U.S.C. § 1101(a)(27)(C) a special immigrant religious worker visa may be issued to an alien who:

i.  for at least 2 years immediately preceding the time of application for admission, has been a member of a religious denomination having a bona fide nonprofit, religious organization in the United States;

ii.  seeks to enter the United States
    (I)    solely for the purpose of carrying on the vocation of a minister of a religious denomination,
    (II)   before September 30, 2015, in order to work for the organization at the request of the organization in a professional capacity in a religious vocation or occupation, or
    (III)  before September 30, 2015, in order to work for the organization at the request of the organization (or a bona fide organization which is affiliated with the religious denomination and is exempt from taxation of an organization described in section 501(c)(3) of Title 26) at the request of the organization in a religious vocation or occupation; and

iii.  has been carrying on such a vocation, professional work or other work continuously for at least the 2-year period described in clause (i).

8 U.S.C. § 1101 (a)(27)(C) (emphasis added).

To establish eligibility for a religious worker visa, an alien or his prospective employer must file a Form I-360 with USCIS.  8 C.F.R. § 204.5(m)(6).  The prospective employer also must complete a supplemental attestation that describes in detail the prospective employer's size, tax status, history of employing alien religious workers, and other facts useful for determining whether the prospective employer is a bona fide religious organization and is offering a legitimate position to the alien.  8 C.F.R. § 204.5(m)(7).

If the religious worker received salaried compensation while employed in the United States during the two-year period prior to the filing of the petition, "the petitioner must submit [Internal Revenue Service ("IRS")] documentation that the [worker] received a salary, such as an IRS Form W-2 . . . or certified copies of income tax returns."  8 C.F.R. § 204.5(m)(11)(i).  If the religious worker received non-salaried compensation while employed in the United States during

that two-year period, "the petitioner must submit IRS documentation of the non-salaried

compensation if available." 8 C.F.R. § 204.5(m)(11)(ii). Another USCIS regulation provides

additional guidance regarding the type of evidence that must be submitted related to the

compensation of the religious worker:

> Initial evidence must include verifiable evidence of how the petitioner intends to
> compensate the alien. Such compensation may include salaried or non-salaried
> compensation. This evidence may include past evidence of compensation for
> similar positions; budgets showing monies set aside for salaries, leases, etc.;
> verifiable documentation that room and board will be provided; or other evidence
> acceptable to USCIS. If IRS documentation, such as IRS Form W-2 or certified
> tax returns, is available, it must be provided. If IRS documentation is not
> available, an explanation for its absence must be provided, along with
> comparable, verifiable documentation.

8 C.F.R. § 204.5(m)(10). Like all petitioners for an immigration benefit, a petitioner seeking an

I-360 religious worker visa must establish eligibility for the visa at the time of filing and

throughout adjudication. 8 C.F.R. § 103.2(b)(1).

## ADMINISTRATIVE RECORD

### I.    Other Petitions Filed by SCS

On September 7, 2006, SCS filed an I-360 special immigrant religious worker petition for

Singh. (Admin. R. at 368–71.) USCIS issued a request for evidence ("RFE") on December 11,

2006, (*id.* at 567–70), a second RFE on April 25, 2007, (*id.* at 407–11), and a notice of intent to

deny ("NOID") on May 1, 2009. (*Id.* at 357–58.) The NOID detailed a July 2008 telephone

interview in which Avtar Singh Pannu ("Pannu"), identified as the President of SCS[1] told USCIS

officers that Singh was employed to clean the Temple. (*Id.* at 357.) The District Director ("the

Director") of the USCIS California Service Center denied this petition on July 13, 2009. (*Id.* at

339–41.) The Director denied the petition on the grounds that (1) Singh was not employed in a

---

[1] *See* Admin. R. at 575-577; 373-376.

religious occupation, and (2) there was insufficient evidence that the proposed duties for Singh related to a religious function. (*Id.* at 340.) The Director rejected as unsupported SCS's allegation that Pannu misspoke during the interview with the USCIS officers due to his allegedly limited proficiency in speaking and understanding English. (*Id.* at 341.)

In July 25, 2011, SCS filed an I-129 Petition for Nonimmigrant Worker seeking an extension of stay for Singh's R-1 nonimmigrant status. (*Id.* at 1000–13.) This petition stated that Singh would be paid an annual salary of $12,950 plus "free boarding/lodging/food & monetary benefits in the form of offerings by devotee or congregation," as well as "extra cash income from performing special services outside [the Temple] at devotees' houses." (*Id.* at 1005, 1010.) On December 2, 2011 USCIS issued a NOID, notifying SCS that during a telephone interview with USCIS officers, Pannu stated that he did not recognize the names of several individuals listed in petitions filed by SCS and that SCS had "reported to the Department of State that they [viz., SCS] have multiple people for whom they petitioned not reporting as religious workers, but working in construction." (*Id.* at 1207–209.) The NOID also requested, *inter alia*, a complete spreadsheet of all employees of SCS from 2007 to present. (*Id.* at 1208.) In response, SCS provided only a list of employees as of December 31, 2011. (*Id.* at 1213.)

In a decision dated January 13, 2012, the Director denied this petition. (*Id.* at 1201–04.) The decision stated that the sole issue was whether Singh's duties related to a traditional religious function. (*Id.* at 1203.) The Director noted that Pannu had informed USCIS officers during the July 2008 telephone interview that Singh was employed by SCS to clean the Temple. (*Id.*) The Director concluded that SCS "has not shown that the [B]eneficiary's essential job functions are inherently or predominantly religious." (*Id.*)

4

Following a number of dismissed motions and appeals, including submission of affidavits concerning Pannu's English proficiency and Singh's religious duties, as well as claims of ineffective counsel, (*id.* at 928–93), SCS filed the final administrative appeal concerning this petition on March 29, 2013. (*Id.* at 922.) Among the documents submitted by SCS was SCS's Form W-2 for Singh for 2012, which was altered in a number of respects. (*Id.* at 940.) For example, the first three numbers of "2012" were printed, but the last number was handwritten. (*Id.*)

In a decision dated June 28, 2013 the USCIS Administrative Appeals Office ("AAO") dismissed the appeal. (*Id.* at 905.) The AAO held that SCS had submitted conflicting evidence as to the duties to be performed by Singh, and thus had failed to show that the Singh would be performing religious duties. (*Id.* at 908–12.) The AAO also held that this petition should be denied because Singh had been in R-1 nonimmigrant status continuously for more than five years, and as a result, he would have to spend at least one year outside the United States to qualify for an extension. (*Id.* at 912–13.)

## II.    The 2009 Petition

On August 28, 2009, SCS filed a second I-360 immigrant petition ("the 2009 Petition") seeking to classify Singh's immigrant status as a special immigrant religious worker, to be employed as a kirtankar – a devotional hymn singer and priest. (*Id.* at 290–97.) It is this petition that is the subject of the instant action. (*See generally*, Compl.) The 2009 Petition claimed that SCS had a staff of four employees and specified that as a kirtankar, Singh would receive an annual salary of "$25000 [sic] plus free boarding & lodging" – as well as "[e]xtra income from performing Kirtan at devotee's home." (Admin. R. at 295–96.) The cover letter from SCS's President, Tehal Singh, alleged that Singh had been employed by SCS since April 12, 2003 and

received an annual salary of $25,000, including free lodging and board valued at $15,400.  (*Id.* at 324.)

On October 27, 2009, USCIS issued to SCS an RFE requesting, *inter alia*, further evidence concerning Singh's work history and proffered position – as well as how SCS intended to compensate Singh.  (*Id.* at 660–61.)  Among the documents requested was Singh's W-2 Form for 2007.  (*Id.* at 660.)  In a letter dated December 2, 2009, SCS described Singh as having fulfilled the duties of a kirtankar in the preceding two year period and specified that Singh "works approximately 40 hours during the weekdays," "works flexible hours during the special weekend services," and "receives extra income in the form of offerings from the devotees."  (*Id.* at 695–96.)  This letter further stated that Singh "receives an annual salary of $25,000 that includes free lodging and boarding valued at $15,400," and that he has been "continuously working with" SCS since April 2003.  (*Id.*)  SCS also submitted a letter from its attorney that, *inter alia*, described the duties of a kirtankar.  (*Id.* at 664.)

The RFE response also provided copies of Singh's tax documents showing business income of $10,400 on his Form 1040 in 2007, and wages of $6,800 from SCS on his 2008 Form 1040 and Form W-2.  (*Id.* at 675, 685, 694.)  However, SCS did not provide Singh's W-2 Form for 2007 as requested in the October 27, 2009 RFE.  (*Id.* at 660.)  Regarding Singh's duties in the preceding two-year period, SCS submitted a statement entitled "Daily Worship in a Gurudwara" that contained a general description of the role of a kirtankar but did not specify Singh's duties in the two-year period prior to the filing of the 2009 Petition.  (*Id.* at 806.)  SCS further provided a copy of its 2006 membership list, on which Singh's name was not listed.  (*Id.* at 727–805.)

In a decision dated January 12, 2010, the Director denied the 2009 Petition.  (*Id.* at 653–57.)  The Director noted that the income reported on Singh's Form W-2 and Form 1040 was

substantially less than the $25,000 salary that SCS claimed it was paying him. (*Id.* at 656.)  The Director also noted that SCS had failed to fully respond to USCIS's requests for detailed information concerning Singh's duties and the number of hours that he had worked, and held that the representations regarding these matters by SCS's counsel did not constitute evidence. (*Id.*) The Director further noted that Singh's name did not appear on the membership list produced by SCS. (*Id.*)

### III.    The Administrative Appeal

On February 12, 2010, SCS filed a Form I-290-B Notice of Appeal of the Director's decision denying the 2009 Petition. (*Id.* at 898.)  In support of the appeal, SCS submitted a letter dated March 12, 2010 alleging that SCS provided Singh with board and lodging as part of his $25,000 salary, such that Singh's cash salary was approximately $10,000 per year. (*Id.* at 823.) The letter further alleged that while SCS had fixed Singh's salary at $10,400 per annum from 2009 onward, he was previously receiving a lower salary, and he earned additional money in the form of offerings from devotees at special events. (*Id.* at 826.)  The letter also discussed the role of a kirtankar and the time generally required for a special event. (*Id.*)  The letter further stated that SCS did not provide W-2s to any employee prior to 2008. (*Id.*)

SCS submitted evidence in connection with its appeal, including a list of special events for SCS for the years 2007 and 2009. (*Id.* at 858.)  However, Singh's name was not listed in relation to any event. (*Id.*)  SCS also submitted new and revised tax documents for Singh, including: a 2009 Form W-2 showing $10,400 in wages, (*id.* at 862); an amended 2008 Form 1040 with Schedule C-EZ, listing business income totaling $19,810 and wages of $6,800, (*id.* at 865, 867); and an amended 2007 Form 1040 with Schedule C-EZ, listing business income of $27,150, (*id.* at 878, 893.)

In a decision dated April 23, 2012, the AAO dismissed the appeal.  (*Id.* at 815–22.)  The AAO noted a discrepancy regarding the date that Singh began working for SCS.  SCS claimed that it had been employing Singh since April 12, 2003, (*id.* at 324), while Singh in his Form G-325A, submitted contemporaneously with the 2009 Petition, (*id.* at 314), stated that he had been in the United States only since August 2004.  (*Id.* at 818.)

The AAO upheld the Director's decision that SCS had not shown that Singh had the requisite continuous experience during the two-year period immediately prior to the filing of the 2009 Petition.  The AAO discussed the tax documents submitted for the first time on appeal, (*id.* at 862–94), and compared them to those submitted in response to USCIS's RFE.  (*Id.* at 675–94.)  The AAO found that the lack of Forms W-2 or 1099 regarding Singh's 2007 income contradicted SCS's statements that it paid Singh a salary, whether $25,000 or $10,000, and also did not explain why Singh's earnings were reported as business income on Schedule C.  (*Id.* at 819.)  The AAO concluded that the amended tax returns for 2007 and 2008, (*id.* at 865, 878), showing an increase in business income, cast doubt on the credibility of SCS's claims that it paid Singh a salary.  (*Id.* at 820.)  The AAO also noted that SCS did not provide any evidence that these amended tax returns were received or accepted by the IRS.  (*Id.* at 820.)

The AAO further found that SCS failed to submit evidence to support SCS's claim that $15,400 of Singh's salary was provided in the form of room and board, as required by 8 C.F.R. § 204.5(m)(11)(ii).  (*Id.* at 820.)  The AAO noted that Singh stated on his Forms I-485 and G-325A, (*id.* at 308, 317), which were submitted contemporaneously with the 2009 Petition, that he resided at 95-30 117th Street, Richmond Hill, New York since August 2004 – but that SCS provided no information as to whether it owned the residence and allowed Singh to live

there rent-free, or whether SCS subsidized Singh's rental payments for the residence.  (*Id.* at 820.)

The AAO also withdrew the Director's finding regarding the lack of evidence of Singh's membership in SCS, but it found that SCS failed to submit verifiable evidence of how SCS intended to compensate Singh, as required under 8 C.F.R. § 204.5(m)(10).  (*Id.* at 822.)  The AAO reiterated the issues regarding the submitted tax documents, (*id.* at 675–94, 862–97), and the lack of verifiable documents regarding the value of the room and board, (*id.* at 822).  The AAO also cited the lack of audited financial statements that might have established that SCS had the ability to compensate Singh.  (*Id.*)  The AAO concluded that the 2009 Petition should be denied for the above reasons, with each reason constituting an independent and alternative basis for denial.  (*Id.*).

**IV.    The May 2012 Motions**

On May 23, 2012, SCS filed a motion to reopen and a motion to reconsider ("the May 2012 Motions") the AAO's dismissal.  (*Id.* at 259–61.)  These motions were predicated on several grounds:  new evidence concerning SCS's ability to pay Singh the offered salary and Singh's living accommodations; affidavits that purported to correct discrepancies regarding Singh's living accommodations; and a claim of ineffective assistance of prior counsel in failing to obtain the requisite W-2 or 1099 statements for all years in question.  (*Id.*)

The evidence submitted by SCS included an affidavit from Gurdev Singh Kang ("Kang"), who identified himself as the President of SCS since December 2011.  (*Id.* at 262.) Kang stated that "Singh is provided living accommodations at our Temple as part of his compensation" and specified that the Temple was located at 95-30 118th Street in Richmond Hill, Queens.  (*Id.* at 262.)  SCS also submitted an affidavit from Singh alleging that he has resided "at

an apartment located in the Temple since I began working for" SCS.  (*Id.* at 263.)  Kang further

alleged in the affidavit that the 2009 Petition's listing of Singh's residence as 95-30 117th Street

was an "obvious . . . typographical error" that should have read 95-30 118th Street, the address of

the Temple.  (*Id.* at 263.)  SCS also submitted the following:  Singh's 2011 Form W-2, showing

$9,100 in wages, (*id.* at 264); an additional copy of Singh's 2009 Form W-2, showing $10,400 in

wages, (*id.* at 265); a copy of Singh's 2009 Form 1040, showing $10,400 in wages plus

additional business income totaling $24,450, (*id.* at 266); a 2008 W-2, showing wages of $6,800,

(*id.* at 268); a 2007 Form 1040, showing business income of only $10,400, (*id.* at 269); various

photos labeled "beneficiary's apartment in temple," (*id.* at 271–75); and property deeds for sites

owned by SCS, (*id.* at 276–87).

The AAO ruled on the May 2012 Motions in a decision dated June 24, 2013.  (*Id.* at 253–

58.)  The AAO:  1) dismissed the motion to reconsider, finding that SCS had not shown that the

AAO's April 23, 2012 decision was incorrect at the time of the issuance of that decision; 2)

granted the motion to reopen to consider the new evidence; and 3) affirmed the dismissal of the

appeal.  (*Id.* at 253–58.)  The AAO rejected as insufficient SCS's claim of ineffective assistance

of counsel.  (*Id.* at 256–57.)  In assessing the credibility of the new affidavits alleging that Singh

had resided at the Temple address of 95-30 118th Street, rather than 95-30 117th Street, (*id.* at

262–63), the AAO pointed to several inconsistencies.  (*Id.* at 257–58.)  As the AAO noted, tax

documents for 2007 and 2008, (*id.* at 675, 679, 685, 687), listed Singh's residence as 97-14 118th

Street, and the 2009 Form W-2, (*id.* at 265), listed his address as 95-30 117th Street.  (*Id.* at 257–

58.)

The AAO held that since Singh's housing at the Temple "is said to be an integral part of

his compensation," evidence that Singh has resided at locations other than the Temple "casts

serious doubt on the credibility of" both SCS and Singh.  (*Id.* at 258.)  The AAO concluded that

the assertions regarding Singh's compensation had been inconsistent and contradictory, and

therefore lacked credibility and did not overcome the stated grounds for denial of the 2009

Petition.  (*Id.*)  The AAO also noted a discrepancy between Singh's 2007 and 2008 federal tax

returns and the biographic information that he submitted in connection with his adjustment of

status application in August 2009.  (*Id.* at 258.)  The 2007 and 2008 federal tax returns listed his

filing status as "single," (*id.* at 675, 685), while the biographic information that he submitted in

August 2009 stated that he had been married since March 2003, (*id.* at 314, 258).  The AAO took

this as an indication "that he misrepresented his marital status on at least two tax returns."  (*Id.*)

The AAO therefore affirmed its April 23, 2012 decision.  (*Id.*)

### V.    The July 2013 Motions

On July 24, 2013, SCS filed a motion to reopen and reconsider ("the July 2013 Motions")

based on an argument put forth by a newly-retained attorney.  (*Id.* at 182–250.)  In a letter filed

in connection with the July 2013 motions, SCS's newly-retained attorney stated that the

preparation of these motions would not have been possible without an interpreter, since Singh is

not proficient in English.  (*Id.* at 192.)  The attorney further stated that SCS's "successive

management is not reliable for an accurate presentation of the facts, as it is comprised of people

who are neither professional administrators, nor do [sic] they possess long term institutional

memory, or consistent command of the ongoing and developing facts."  (*Id.*)  The attorney also

stated that SCS's "two (2) prior attorneys have further complicated the muddled record" and that

their "negligence" and "incompetence . . . is exemplified by the inconsistencies in presentation."

(*Id.* at 193.)  The attorney argued that the evidence submitted in support of the July 2013

Motions was now the best evidence of Singh's remuneration.  (*Id.*)

The attorney sought to explain the business income reported by Singh by claiming that SCS "directed Singh receive additional remuneration by donations directly from its congregants." (*Id.* at 193.)  The attorney also sought to explain why Singh had filed tax returns as a single person despite being married.  (*Id.* at 194.)  The attorney claimed that at the time Singh filed those returns, Singh was living alone because his wife and children were then residing outside the United States.  (*Id.*)  The attorney further stated that SCS provided "free room and board" to Singh, and that he resided at 95-30 117th Street.  (*Id.* at 194.)  The evidence that SCS submitted with the July 2013 Motions included: IRS transcripts regarding Singh's earnings for 2007, 2008, and 2009, (*id.* at 196–206); a statement signed by forty-five members of SCS concerning Singh's employment, (*id.* at 207–08); a copy of a lease agreement dated September 1, 2008 for Singh's occupancy of 95-30 117th Street for the period September 2008 to August 2010, (*id.* at 209–12); documentation relating to the site of SCS's Temple and nearby properties, (*id.* at 213–36); and copies of Singh's family members' passports, visas, and entry stamps, presented in an effort to explain the family members' arrival date and Singh's change of residence.  (*Id.* at 237–49.)

The AAO decided the July 2013 Motions in a decision dated December 3, 2013.  (*Id.* at 173–80.)  The AAO:  1) granted the motion to reopen; 2) dismissed the motion to reconsider, finding that SCS did not establish any error of fact or law in the AAO's prior decision; and 3) affirmed the denial of the 2009 Petition.  (*Id.* at 174–80.)  The AAO determined that the IRS transcripts submitted by SCS, (*id.* at 196–206), introduced no new facts, except to support previously submitted uncertified documents.  (*Id.* at 177.)  Additionally, the AAO held that the statement of the members of the congregation, (*id.* at 207–08), did not establish that the members

were in a position to have personal knowledge that Singh's employment had been, and continued to be, full-time.  (*Id.* at 177.)

The AAO also noted that SCS "has submitted independent, objective evidence regarding its control of various residential properties, but . . . has made conflicting claims regarding the beneficiary's use of those properties."  (*Id.* at 179.)  In reviewing the claim that Singh was residing at 95-30 117th Street, (*id.* at 194), the AAO observed that SCS had now abandoned its prior position, set forth in the affidavits of Singh and Kang, that Singh "resided 'in the Temple' and 'that a typographical error occurred somewhere.'"  (*Id.* at 179.)  Further, the AAO noted that while the lease agreement for 95-30 117th Street submitted by SCS indicated that the lease began in September 2008, (*id.* at 209), Singh's Form I-485 and G-325A, (*id.* at 314, 318), listed that address as Singh's residence beginning in August 2004 – more than four years before the commencement date of the lease agreement.  (*Id.* at 178.)

The AAO determined that the totality of evidence contained sufficient conflicting assertions to cast doubt on the claims and authenticity of the newly-submitted lease agreement. (*Id.*)  The AAO concluded that SCS had not overcome the previous finding of a lack of credibility and had failed to submit "verifiable documentary evidence of its intent and ability to compensate the beneficiary."  (*Id.*)  The AAO therefore affirmed its June 24, 2013 decision and the denial of the 2009 Petition.  (*Id.*)

**VI.    The January 2014 Motions**

On January 6, 2014, SCS filed motions to reopen and reconsider ("the January 2014 Motions").  (*Id.* at 81–170.)  The evidence submitted by SCS included:  a letter from Kang, again identified as President of SCS, dated January 2, 2014, explaining the "Notes Payable" entries in SCS's financial statements, (*id.* at 81), together with copies of audited financial statements for

years ending June 30, 2007, June 30, 2008, June 30, 2009, and June 30, 2010, and prepared

financial statements for the years ending June 30, 2011 and June 30, 2012.  (*Id.* at 97–170).  In

support of the January 2014 Motions, counsel argued that the newly submitted evidence

overcame the denial of the 2009 Petition on the grounds of SCS's inability to pay Singh, which,

according to counsel, was the only basis for the AAO's December 3, 2013 decision.  (*Id.* at 92.)

Counsel further argued that, to the extent that the December 3, 2013 decision was based on a

holding that SCS had failed to show that Singh had been employed fulltime during the two year

period prior to the filing of the 2009 Petition, the decision was erroneous as a matter of fact and

law.  (*Id.* at 93–96.)

     The AAO ruled on the January 2014 Motions in a decision dated August 29, 2014.  (*Id.* at

61–66.)  The AAO granted the motion to reopen to consider the new evidence, and dismissed the

motion to reconsider, finding that SCS did not establish that the December 3, 2013 decision was

based on an incorrect application of law or policy, or that the decision was incorrect based on the

evidence of record when it was issued.  (*Id.* at 62, 66.)  In reviewing the new financial statements

in evidence, (*id.* at 97–170), the AAO found that these documents were insufficient to satisfy the

requirements of 8 C.F.R. §204.5(m)(10), which "concerns not just the petitioner's ability to

compensate the beneficiary, but its intention to do so."  (*Id.* at 64.)

     The AAO further determined that the evidence surrounding SCS's past payments to

Singh was directly material to the question of its intention to compensate Singh.  (*Id.*)  The AAO

restated the December 3, 2013 decision's analysis of the conflicting evidence surrounding

Singh's compensation and housing.  (*Id.* at 63; *see also id.* at 174–80.)  The AAO also noted

SCS's conflicting assertions regarding Singh's compensation.  The 2009 Petition, at one point,

stated that Singh's salary would be "$25,000 plus free boarding and lodging."  (*Id.* at 64 citing

*id.* at 296.)  In contrast, in its July 25, 2011 Form I-129 R-1 Petition for Singh, SCS claimed that

Singh's salary would be $12,950 per year plus "free boarding/lodging/food & monetary benefits

in the form of offerings by devotee or congregation."  (*Id.* at 63–64 (quoting *id.* at 1005).)  The

AAO therefore found that SCS had "made conflicting claims and submitted altered

documentation in seeking immigration benefits for the beneficiary."  (*Id.* at 64.)

> The AAO also addressed the following argument in SCS's brief:

> Here since the AAO has identified a discrepancy which "raises legitimate doubts"
> regarding whether the beneficiary actually received a salary from [SCS], therefore
> by providing evidence of his financial support by the congregation [SCS] has
> mooted those doubts by showing that even if in fact the beneficiary received no
> salary and no living quarters from [SCS] during the two years prior to filing of the
> petition, still he has managed to support himself with contributions from the
> members of [SCS's] congregation.

(*Id.* at 65 (quoting *id.* at 95).)  The AAO found that the argument "acknowledges 'a discrepancy'

but does not directly address it and submits nothing to resolve it or explain [SCS]'s and Singh's

contradictory claims."  (*Id.* at 65; *see id.* at 209–12, 262–63, 271–75, 295–96, 314, 318, 675–94,

695–96, 823–27, 862–94.)  The AAO held that the discrepancies therefore remained a factor that

cast doubt on SCS's claims that it compensated Singh with housing.  (*Id.* at 65.)  The AAO also

noted that, if Singh had relied entirely on contributions from the congregation for income, then

SCS's representations to USCIS that SCS would pay Singh a salary would have been incorrect,

thereby confirming concerns as to SCS's credibility.  (*Id.* at 66.)

The AAO went on to address SCS's argument that the regulations contain no express

requirement that an I-360 petition's beneficiary be employed fulltime during the two-year period

prior to the filing of such a petition.  (*Id.* at 66.)  The AAO noted that it had never held that

Singh's employment during the two-year period prior to the filing of the 2009 Petition would not

qualify unless that employment was fulltime.  (*Id.*)  However, the AAO held, the issue of

whether Singh had worked fulltime during that period was relevant to an assessment of SCS's
credibility, since SCS represented that Singh had worked fulltime during that period.  (*Id.*)  The
AAO thus affirmed the December 3, 2013 decision and the denial of the 2009 Petition.  (*Id.*)

## VII.    The October 2014 Motion to Reopen

On October 2, 2014, SCS filed a motion to reopen ("the October 2014 Motion to
Reopen").  (*Id.* at 15–16.)  In a brief submitted in support of the October 2014 Motion to Reopen,
counsel asserted that "this motion contains independent and objective evidence resolving any
material inconsistencies in the record."  (*Id.* at 15.)  Counsel asserted that the AAO had
determined that SCS had filed a "fraudulent" form W-2 in support of an R-1 petition and sought
to rebut that alleged finding.  (*Id.* at 16.)  Also in connection with the October 2014 Motion to
Reopen, SCS submitted an affidavit from Singh in Punjabi, along with an English translation,
dated September 29, 2014.  (*Id.* at 23–24.)  Singh alleged in the affidavit that "I don't remember
signing any letter saying that I had always lived at the Temple."  (*Id.* at 23.)  Singh also stated:
"If I did sign such a statement, I couldn't've understood it if it was in English."  (*Id.*)  He further
stated that he resided at 97-14 118th Street from September 2003 until September 2008, when he
moved to 95-30 117th Street with his family, and then moved back to 97-14 118th Street in
September 2010.  (*Id.*)

Also in support of the October 2014 Motion to Reopen, SCS submitted a letter dated
September 19, 2014 from Dr. Jay Anand, who identified himself as the voluntary accountant of
SCS.  (*Id.* at 35–36.)  Dr. Anand attached to his letter W-2 Forms for Singh and three other
individuals.  (*Id.* at 37–38.)  In his letter, Dr. Anand admitted that the W-2 Form for Singh
"contains multiple alternations [sic], such as the year on the form is changed to 2012 by hand
altering the last number, and lines 1, 3–6 & 18 are all 'whited out' and hand altered."  (*Id.* at 35.)

Dr. Anand also stated that a Form W-3 was attached to his letter.  (*Id.* at 36.)  However, no such

form was attached to the letter.  In further support of this motion, SCS also submitted property

ownership records for 97-14 118th Street, (*id.* at 25–30); an additional copy of the previously-

submitted lease for September 2008 to August 2010 for Singh's occupancy of 95-30 117th Street,

(*id.* at 31–34); and copies of IRS transcripts for Singh's 2008, 2009, and 2012 tax years, (*id.* at

39–58).

In a decision dated March 4, 2015, the AAO granted the October 2014 Motion to Reopen

but affirmed the denial of the 2009 Petition.  (*Id.* at 2–9.)  The AAO addressed counsel's claim

that the AAO had improperly described the W-2 Form as "fraudulent."  (*Id.* at 7.)  Quoting from

its June 28, 2013 decision on the appeal of the July 25, 2011 R-1 petition, (*id.* at 911), the AAO

noted that it had described the form as "altered" and had never used the word "fraudulent" to

describe the form.  (*Id.* at 7.)  The AAO also pointed to the letter from Dr. Anand, (*id.* at 35),

which acknowledged the Form W-2 alterations but did not explain the reason for the alterations.

(*Id.* at 7.)  The AAO said that the IRS transcript for 2012, (*id.* at 53), shows $6,800 in wages for

2012, which is nearly $10,000 less than that shown on the altered W-2.  (*Id.* at 7.)

The AAO noted that SCS had failed to submit a copy of Singh's W-2 Form for 2007,

"even though the [D]irector had specifically requested that document in October 2009."  (*Id.* at

7; *see id.* at 660.)  The AAO also noted that Singh's 2008 tax return showed reported wages of

$6,800, (*id.* at 685), which is less than the approximately $10,000 that SCS claimed, (*id.* at 324),

was his salary.  (*Id.* at 8.)  The AAO acknowledged that Singh had later amended that return to

add $19,810 in business income, (*id.* at 856, 867), but held that "amended tax returns, filed after

the [D]irector raised concerns about the beneficiary's compensation, have diminished evidentiary

weight."  (*Id.* at 8.)

The AAO determined that the totality of the record – including all prior and contradictory affidavits from Singh regarding his living arrangements and major discrepancies in salary evidence – raised questions of credibility, and that Singh's newest affidavit does not account for SCS's prior statements attesting to the accuracy of Singh's earlier, now-disavowed affidavit.  (*Id.* at 9.)  The AAO noted that SCS had signed the 2009 Petition "under penalty of perjury, and as such, [SCS] has a legal obligation to provide truthful and accurate information throughout the course of the proceeding."  (*Id.* at 9.)  The AAO concluded that "throughout this proceeding, [SCS] has provided conflicting information regarding Singh's salaried and non-salaried compensation."  (*Id.*)  The AAO thus affirmed its August 29, 2014 decision and the denial of the 2009 Petition.  (*Id.*)

## DISCUSSION

### I.     Judicial Review Under the Administrative Procedure Act

SCS filed the instant action on September 4, 2015, pursuant to 5 U.S.C. § 701 *et seq.* of the Administrative Procedure Act, challenging the denial of SCS's 2009 Petition on the ground that it was arbitrary and capricious.  (Compl. (Doc. No. 1) at 2.)

A court's review in an APA case is limited to the administrative record.  5 U.S.C. § 706; *Camp v. Pitts*, 411 U.S. 138, 142 (1973); *United States v. Int'l Broth. of Teamsters*, 170 F.3d 136, 142 (2d Cir. 1999).  They present only a question of law, and the district court conducts what is essentially an appellate review of the challenged administrative action.  *Just Bagels Mfg., Inc v. Mayorkas*, 900 F. Supp. 2d 363, 372 n.7 (S.D.N.Y. 2012).  As such, these cases are frequently disposed of on cross-motions for summary judgment.  *Gosnell v. FDIC*, 938 F.2d 372, 375 (2d Cir. 1991); *Miezgiel v. Holder*, 33 F. Supp.3d 184, 186 (E.D.N.Y. 2014).

"Under 5 U.S.C. § 706(2)(A) [of the APA,] a reviewing court must hold unlawful and set aside any agency action found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Karpova v. Snow*, 497 F.3d 262, 267 (2d Cir. 2007).  "The plaintiff bears the burden of showing that the agency's action should be set aside." *Tarbell v. Dep't of Interior*, 307 F. Supp 2d 409, 420 (N.D.N.Y. 2004); *Miezgiel*, 33 F. Supp. 3d at 189.  Abuse of discretion has been characterized as any decision 'made without a rational explanation, [or that] inexplicably depart[s] from established policies or rest[s] on an impermissible basis….'" *Huq v. INS*, 199 F.3d 1322 (2d Cir. 1999) (quoting *Wong Wing Hang v. INS*, 360 F.2d 715, 719 (2d Cir. 1966)).

However, "[a]ppropriate deference must be accorded [the agency's] decisions." *Egan v. Weiss*, 119 F.3d 106, 107 (2d Cir. 1997) (citing *INS v. Miranda*, 459 U.S. 14, 18–19, n. 4 (1982) (per curiam)).  "Courts should not substitute their judgment for that of the agency." *Karpova*, 497 F.3d at 267.  A reviewing court must "determine whether the agency has considered the pertinent evidence, examined the relevant factors, and articulated a satisfactory explanation for its action." *Tarbell*, 307 F. Supp. 2d at 420 (citing *J. Andrew Lange, Inc. v. F.A.A.*, 208 F.3d 389, 391 (2d Cir. 2000)) (internal quotation marks omitted).  "[A]n agency determination will only be overturned when the agency 'has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Karpova*, 497 F.3d at 267–68 (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

## II.    The Petition Was Properly Denied

A person or entity that petitions for an immigration benefit is "responsible for . . . ambiguities in the record, and it is incumbent upon the petitioner to resolve . . . inconsistencies by independent and objective evidence." *Matter of Ho*, 19 I. & N. Dec. 582, 591 (BIA 1988). Where the record contains inconsistencies, a petitioner bears the burden of coming forward with "competent objective evidence pointing to where the truth, in fact, lies." *Id.* at 592. Inconsistencies or other deficiencies in certain evidence submitted by the petitioner "may, of course, lead to a reevaluation of the reliability and sufficiency of the remaining evidence." *Id.* (dismissing appeal challenging revocation of visa petition, *inter alia*, due to conflicting statements made by the petitioner and his wife).

Accordingly, courts frequently reject APA challenges to administrative decisions denying immigration benefits where the evidence submitted by the petitioner contains inconsistencies. *See, e.g.*, *Ukrainian Autocephalous Orthodox Church v. Chertoff*, 630 F. Supp. 2d 779, 788–89 (E.D. Mich. 2009) (religious worker petition); *Spencer Enter. v. United States*, 345 F.3d 683, 694 (9th Cir. 2003) (petition for immigrant investor visa); *Estrada-Hernandez v. Holder*, 108 F. Supp.3d 936, 948 (S.D. Cal. 2015) (employment petition); *Z-Noorani v. Richardson*, 950 F. Supp.2d 1330, 1344 (N.D. Ga. 2013) (same); *Sofiane v. DHS*, No. 09-CV-1869 (JCH), 2010 WL 3169377, at *3 (D. Conn. Aug. 11, 2010) (alien relative petition).

In this case, the AAO properly concluded that the evidence proffered by SCS in support of its petition contained significant and material inconsistencies in connection with key facts proffered by SCS in support of its position, in particular, inconsistencies related to the housing and non-housing compensation paid to Singh by SCS. Briefly put, over the course of more than five years, SCS submitted to USCIS and the AAO numerous documents containing

20

discrepancies, outright inconsistencies, ambiguities, and unexplained alterations. Those documents, which set forth representations about Singh's income and housing arrangements, formed the primary basis of USCIS's and the AAO's many decisions denying the 2009 Petition and affirming that denial. (*See, e.g.*, *id*. at 660–61, 656, 820, 258, 179, 20–21, 6, 9.) By requesting additional evidence and reopening the case no fewer than four times, USCIS and the AAO identified the discrepancies at issue and gave SCS myriad opportunities to correct them, all to no avail. (*See id.* at 252–58, 173–79, 17–23, 1–9.) This pattern of contradictions, ambiguities, and altered and unreliable evidence permeated the administrative record, and undermined the credibility of the affidavits of SCS's representatives and the Petition as a whole. Even SCS's own attorney acknowledged that SCS was not a reliable source of information as to the details of Singh's employment and compensation during the relevant period. For the reasons set forth in more detail below, the AAO properly concluded that SCS failed to meet its burden of establishing Singh's eligibility for a religious worker visa.

### a. Discrepancies in Tax Documents Submitted by SCS

In the 2009 Petition, filed in August 2009, SCS alleged that Singh received annual income from SCS of $25,000, consisting of lodging and board valued at $15,400, as well as monetary compensation of $9,600. (*See* Admin. R. at 324, 823.) Those allegations are not supported by the tax documentation in the record for 2008, the last full year prior to the submission of the I-360 Petition.

Singh's Form 1040 for 2008 lists only $6,800 in wages, and no other income. (*Id.* at 685–86.) An amended Form 1040 for 2008 lists $6,800 in wages and $19,810 in business income. (*Id.* at 863–68.) Thus, both the original and amended Forms 1040 for 2008 contradict SCS's allegation that it was paying Singh $9,600 in wages. That allegation is further

contradicted by Singh's 2007 Form 1040, which lists no salary at all and business income of $27,150.  (*Id.* at 880.)  In addition, Singh has repeatedly failed to furnish his 2007 Form W-2, which might have shed light on those discrepancies.  (*See, e.g.*, *id.* at 660.)

Among the most troubling pieces of evidence submitted by SCS is Form W-2 for 2012 containing blatant, unexplained alterations made by hand.  (*Id.* at 37–38.)  Even Dr. Anand, SCS's accountant, admitted in a letter to USCIS that the Form W-2 "contains multiple alternations [sic], such as the year on the form is changed to 2012 by hand altering the last number, and lines 1, 3-6 & 18 are all 'whited out' and hand altered."  (*Id.* at 35.)  Anand, however, provided no explanation whatsoever as to why the form was altered.[2]  Moreover, Anand stated in his letter that he was enclosing a Form W-3, but no such form was enclosed with his letter.  (*Id.* at 36.)

SCS argues that it corrected the discrepancies above by submitting additional tax forms.  (SCS Br. Summ. J. at 4–5.)  However, as the AAO concluded, far from resolving discrepancies, the additional tax documents submitted by SCS actually introduce new ambiguities and contradictions concerning the income that Singh received during the relevant period.

### i.  SCS's Attempt to Resolve the Tax Discrepancies

SCS claims to have resolved the discrepancies described above by submitting Singh's IRS transcripts for the years 2007–2009 and Singh's FICA withholding history printout.  (SCS Br. Summ. J. at 4–5.)  However, SCS offered no explanation, either to the AAO or in its brief in this action, as to how the additional submissions resolve the discrepancies described above, and

---

[2] The Court notes that in finding that the W-2 was altered, the AAO stated that the $16,250 amount of wage income for 2012 listed on the W-2 is greater than the $6,800 amount of wage income on the IRS transcript for that year.  (*Id.* at 7.)  In fact, the transcript for 2012 lists the same amount of wage income as the W-2; it is the transcript for 2008 that lists the amount of wage income as $6,800.  (*Id.* at 41, 53.)  This issue in no way affects the AAO's finding that the W-2 was altered, as Anand admitted that the W-2 was altered, and the alterations are apparent from an examination of the W-2.  (*See id.* at 35, 38.)

an examination of those documents shows that they raise altogether new discrepancies.  (*See generally* SCS Br. Summ. J.; SCS Reply Mem. (Doc. No. 18).)  The IRS transcripts reflect the following figures:

|      | Adjusted Gross Income | Self-Employment Income | Other Income[3] |
|------|----------------------:|-----------------------:|----------------:|
| **2007** | $25,232 | $25,073 | $159 |
| **2008** | $25,210 | $16,260 | $8,950 |
| **2009** | $33,122 | $22,580 | $10,542 |

(Admin. R. at 200, 198, 196.)

Almost all of the income for 2007 is self-employment income.  That leaves only $159 in income that may have taken the form of a salary or other compensation paid by SCS, in contrast with the $25,000 that SCS purported to have paid Singh.  Similarly, almost two-thirds of the 2008 income is self-employment income, leaving only $8,950 that could have been paid by SCS – again, a far cry from the $25,000 in compensation that SCS alleged.  Finally, more than two-thirds of the adjusted gross income reflected in Singh's 2009 IRS transcript is self-employment income, leaving only $10,542 that might have been paid in the form of salary or housing by SCS. In sum, the IRS tax transcripts reflect that a large portion of Singh's overall income from 2007 through 2009 – which ranged from about $25,000 to $33,000 – was self-employment income. Therefore, those documents do not corroborate SCS's claim that it paid Singh $25,000 in salary and housing.  Moreover, the FICA withholding printout makes no mention of any "other income" from 2007 through 2009, (*id.* at 205), and thus contradicts the IRS transcripts from those years.  Thus, SCS's submission of Singh's IRS transcripts and his FICA withholding printout only added to the discrepancies raised by its earlier submissions.

---

[3] The "other income" figures are derived by subtracting self-employment income from adjusted gross income.

**b.  Discrepancies in The Evidence Regarding Singh's Housing**

Just as there are discrepancies in the tax documents that SCS submitted concerning

Singh's monetary compensation, there are outright contradictions in the affidavits that SCS

submitted concerning Singh's housing.  In May 2012, SCS filed with USCIS an affidavit ("the

2012 Affidavit") sworn to by Singh on May 20, 2012.  (*See id.* at 263.)  Singh stated in the 2012

Affidavit that: "I have always lived at the Temple since I entered to the United States;" the

Temple is located at "95-30 118th Street, Richmond, Hill, New York;" and, "[m]y living

accommodations are part of my compensation for serving at the Temple."  (*Id.* at 263.)  In

October 2014, SCS filed with the AAO an affidavit ("the 2014 Affidavit") sworn to by Singh on

September 29, 2014.  The 2014 Affidavit disavowed all the 2012 Affidavit's sworn statements

regarding the location of Singh's residence.  Singh, in the 2014 Affidavit, claimed: "I don't

remember signing any letter [sic] saying that I had always lived at the Temple," and, "[i]f I did

sign such a statement I couldn't've understood it if it was in English."  (*Id.* at 23.)  Singh also

stated in the 2014 Affidavit that during his time in the United States, he has resided at only two

locations, neither of which is the Temple; he stated that he resided at 97-14 118th Street during

all of his time in the United States, except for the period September 8, 2008 to September 1,

2010, when he resided at 95-30 117th Street.  (*Id.*)  The 2012 Affidavit and 2014 Affidavit thus

obviously convey conflicting information.  Moreover, Singh's statement in the 2014 Affidavit

that he could not have understood any document written in English raises serious questions about

why SCS submitted the 2012 Affidavit, which was written in English and not translated into any

other language.

Furthermore, the contradictory statements by Singh in the 2012 Affidavit and the 2014

Affidavit conflict, in turn, with other statements that he made.  On a G-325 biographic

information form submitted in connection with his I-485 application for permanent residence in August 2009, Singh stated that he resided at 95-30 117th Street from August 2004 onward. (Admin. R. at 314; *see also id.* at 308.)  In contrast, on his 2007 and 2009 tax returns, Singh listed his address as 97-14 118th Street.  (*Id.* at 266, 269.)

Documents in the record also raise credibility issues with respect to the affidavit of Mr. Kang, who identified himself as president of SCS in May 2012.  At the same that SCS submitted the 2012 Affidavit, SCS submitted an affidavit sworn to by Kang, in which he stated that "[Singh] is provided living accommodations at the Temple as part of his compensation."  (*Id.* at 262.)  As the AAO noted, "[Singh's] assertion [in the 2014 Affidavit] of a language barrier does not explain" why Kang would state that Singh resided at the Temple.  (*Id.* at 6.)  Moreover, it does not explain why SCS would submit Kang's affidavit despite knowing of such a language barrier.

### c.  SCS's Attorney's Statement Regarding the Reliability of SCS's Submissions

Even SCS's own attorney raises concerns about the reliability of SCS's submissions.  In a letter in support of the July 2013 Motions, the attorney stated that SCS's "successive management is not reliable for an accurate presentation of the facts, as [SCS's management] is comprised of people who are neither professional administrators, nor do [sic] they possess long term institutional memory, or consistent command of the ongoing and developing facts."  (*Id.* at 192.)  The record clearly supports this acknowledgment, and, when taken together with the many contradictions in the evidence submitted by SCS, the AAO was certainly entitled to conclude that the evidence presented by SCS lacked "the reliability and sufficiency" necessary for SCS to carry its burden with regard to the 2009 Petition.  *Matter of Ho*, 19 I. & N. Dec. at 591–92.

### III.    The Materiality of the Evidentiary Discrepancies SCS's Evidence

SCS's primary contention on this motion is that the conflicting allegations regarding Singh's housing and compensation in the two-year period immediately prior to the filing of the 2009 Petition do not concern a material issue because Sing was eligible for a special immigrant religious worker visa even if he received *no* compensation for his work during that two-year period. (*See* SCS Br. Summ. J. at 6-10; 11-13.)  Because compensation is not required, SCS contends, any discrepancies in evidence pertaining to whether Singh was compensated – or the amount of that compensation – are immaterial and cannot be the basis for an adverse credibility finding regarding dispositive issues.  (*See id.* at 13.)

This contention ignores the fact that, if a visa petitioner alleges that the beneficiary has been compensated for his work during the two-year period preceding the filing of a petition, USCIS regulations require that the petitioner provide information concerning that compensation. If the beneficiary received salaried compensation while employed in the United States during that two-year period, "the petitioner must submit [Internal Revenue Service ("IRS")] documentation that the [worker] received a salary, such as an IRS Form W-2 . . . or certified copies of income tax returns."  8 C.F.R. § 204.5(m)(11)(i).  If the beneficiary received non-salaried compensation while employed in the United States during that two-year period, "the petitioner must submit IRS documentation of the non-salaried compensation if available." 8 C.F.R. § 204.5(m)(11)(ii).  *See also* 8 C.F.R. § 204.5 (m)(10) (setting forth the types of evidence that must be submitted concerning compensation).  Thus, once a petitioner alleges that it paid compensation to the beneficiary for whom it is advocating, documentation concerning that compensation becomes essential to the petition.

SCS alleged in the 2009 Petition that it compensated Singh for his work during the two-

year period prior to the filing of the petition.  (Admin. R. at 295–96, 324.)  Since SCS represented that it had compensated Singh, that representation became part of the basis for its claim, and the applicable regulations require that SCS provide sufficient, credible evidence concerning that compensation.  In effect, by representing that it had compensated Singh during the relevant time period, SCS caused that compensation to become material for purposes of the 2009 Petition.  The discrepancies in SCS's filings regarding that compensation therefore concerned an issue that was material to the 2009 Petition.  A contrary conclusion would effectively nullify the above-cited regulations. [4]

Moreover, the discrepancies in SCS's submissions are not solely a matter of slight differences in factual allegations, as SCS appears to contend.  (*See* SCS Br. Summ. J. at 12–13.) First, the discrepancies are material as they include, *inter alia*: SCS's submission of a sworn affidavit that the affiant – i.e., Singh – subsequently denied signing and claimed he could not have understood if it was presented to him, because it was written in English; and SCS's submission of a tax document that SCS admits was altered, without giving an explanation for the alterations.[5]  SCS proffered and relied on this information in support of its petition, and once it

---

[4] SCS contends, in substance, that it should not be required to comply with the regulations that require the submission of documents relevant to compensation.  It claims that a beneficiary's past "housing and non-housing compensation are factors which Congress has not intended USCIS to consider in determining an individual's eligibility for" a special immigrant religious worker visa.  (SCS Br. Summ. J. at 6.)  This contention overlooks a statutory requirement for the issuance of not just a special immigrant religious worker visa, but visas in general – that the beneficiary is not "likely at any time to become a public charge."  8 U.S.C. § 1182(a)(4)(A).  By requiring a petitioner to provide evidence concerning the compensation paid to the beneficiary – or, if the beneficiary was not compensated, evidence of how he supported himself – these regulations seek to ensure, consistent with Congress's command, that the beneficiary not become a public charge.  It was therefore incumbent upon SCS to provide the evidence required by these regulations in order to show that Singh would not likely become a public charge.  This is yet another reason why the discrepancies in the evidence submitted by SCS were not only material but vital to the disposition of Singh's petition.

[5] SCS suggests that its accountant stated in an affidavit that the form "was simply corrected to accurately reflect the true facts."  (SCS Br. Summ. J. at 5.)  In fact, the accountant merely stated that "[t]he form, as altered, contains correct information, including that [Singh] was paid wages of $16,250 in 2012."  (Admin. R. at 35.)  The accountant provided no explanation for why the document was altered, who did so, or why SCS could not produce an unaltered document.

did so, it put these matters in issue. Moreover, these discrepancies alone raise serious concerns

about SCS's credibility, regardless of whether the underlying factual issues are material.[6]

## IV.   The Members' Statement

SCS also contends that the AAO improperly disregarded a statement signed by SCS

members, (Admin.R. 207-208), that Singh had been providing services to SCS on a full-time

basis since February 2004.  SCS contends that in its December 3, 2013 decision, the AAO held

that full-time employment was required for an I-360 Petition, but that the AAO expressly

disclaimed that requirement in the AAO's August 29, 2014 decision.  (SCS Reply. Mem. at 13-

14.)  SCS's claim is without merit.

SCS is correct that the AAO declined to credit the members statement in its December 3,

2013 decision, but did so finding that the members' representation that Singh had been employed

since February 2004 was inconsistent with SCS's representation in the 2009 Petition that Singh

began working for SCS in April 2003 or 2004.  (Admin. R. at 177, 324.)  Moreover, the AAO

found that the members' statement was not accompanied by any evidence demonstrating that the

signatories "were or are in a position to have personal knowledge that [Singh's] employment has

been and continues to be full-time."  (Admin. R. at 177.)  In reaching this conclusion, the AAO

properly questioned the personal knowledge of the temple members as to the nature and scope of

Singh's employment, and in no way suggests that Singh's employment must be full-time in order

to meet the work requirement.  In fact, the AAO's December 3, 2013 decision contains no such

---

[6] Ironically, SCS notes that the AAO's April 23, 2012 decision contains two contradictory statements about Singh's continuous work in the United States and claims that because of these facially contradictory statements, the original decision of USCIS is "not in accordance with law."  (SCS Br. Summ. J. at 4; SCS Reply. Mem. at 2.)  SCS does not cite any legal authority for that proposition.  (*See generally id.*)  Moreover, through all of its decisions, the AAO consistently affirmed USCIS's finding that SCS did not demonstrate Singh fulfilled the Work Requirement.  (*See id.* at 252–258, 173–179, 17–23, 1–9.)  In light of those opinions – and the litany of discrepancies in the evidence submitted by SCS – the lone contradictory statement in the AAO's April 23, 2012 opinion appears to be a mere scrivener's error.  (SCS Reply. Mem. at 2.)

holding.  And as such, the August 29, 2014 decision (Admin R. at 66) did not, and could not, disclaim such a holding, as SCS contends.  Rather, the August 29, 2014 decision expressly noted that the December 3, 2013 decision's discussion of this issue pertained to "general issues of credibility" – that is, whether the statements were accurate and based on personal knowledge, issues that bear on the credibility of SCS and its evidentiary submissions as a whole.  Thus, the AAO properly considered the reliability of the members' statement and accorded it no weight, particularly in light of the all of the other contradictions, inconsistencies and ambiguities in the record concerning Singh's compensation.

## CONCLUSION

For the reasons stated in this Memorandum and Order, the Court finds that the AAO properly denied SCS's petition.  As such, SCS's motion for summary judgment is denied, and USCIS's motion for summary judgment is granted.  The Clerk of Court is respectfully requested to enter judgment accordingly, and close the case.

SO ORDERED.

*Roslynn R. Mauskopf*

Dated: Brooklyn, New York
        March 30, 2017

_____
ROSLYNN R. MAUSKOPF
United States District Judge